**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**TOMECA EMANUEL,[1]**

      Plaintiff,

v.

                         Civil Action No. 7:14-CV-108 (HL)

**HOSPITAL AUTHORITY OF
VALDOSTA AND LOWNDES
COUNTY, GEORGIA**,

      Defendant.

## ORDER

Plaintiff Tomeca Emanuel, a disabled individual, brings this action against Defendant Hospital Authority of Valdosta and Lowndes County, Georgia for alleged employment discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. Plaintiff further alleges that her former employer retaliated against her for exercising her statutory right to medical leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*. Now before the Court is Defendants' Motion for Summary Judgment. (Doc. 22). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, and determining that there is no genuine dispute

---

[1] The caption of both Plaintiff's Complaint (Doc. 1) and Amended Complaint (Doc. 13) list her name as "Toneca Emanuel." However, it is apparent from the record that Plaintiff's name is "Tomeca." The Clerk of Court is directed to correct this misspelling in the docket.

of the material facts, the Court finds that Defendant is entitled to judgment as a matter of law and grants Defendant's motion.

## I.  FACTUAL BACKGROUND[2]

### A.  Plaintiff's Employment and Disciplinary History

Defendant Hospital Authority of Valdosta and Lowndes County, Georgia owns and operates South Georgia Medical Center ("SGMC"). (Doc. 22-1, ¶ 1). SGMC is a non-profit, regional acute care referral hospital located in Valdosta, Georgia. (Doc. 22-1, ¶ 2). Defendant hired Plaintiff Tomeca Emanuel on April 30, 2001 to serve as an endoscopy technician in SGMC's endoscopy laboratory. (Doc. 22-1, ¶¶ 3-4; Pl. Dep., p. 17).

Within the first four months of her employment, Defendant placed Plaintiff on her first 30-day performance improvement plan. (Doc. 22-1, ¶ 4). The purpose

---

[2] Plaintiff's Statement of Disputed and Undisputed Facts (Doc. 26-1) does not comply with Local Rule 56:  "The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of materials facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried. Response shall be made to each of the movant's numbered material facts." M.D.Ga. L.R. 56. Rather than responding to each numbered paragraph as directed by the rule, Plaintiff essentially has responded in the form of a supplemental brief, which is insufficient under the local rule. The Court accordingly deems admitted Defendants' statement of facts that are properly supported by citations to the record. M.D.Ga. L.R. 56; see also Mann v. Taser Intern., Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (holding that district court properly deemed defendant's statement of material facts admitted when plaintiff failed to comply with the local rule); BMU, Inc. v. Cumulus Media, Inc., 366 Fed. App'x 47, 49 (11th Cir. 2010) (affirming grant of summary judgment when respondent failed to file a response to movant's statement of undisputed facts).

of the action plan was to address Plaintiff's performance deficiencies, improve Plaintiff's attitude and responsiveness toward co-workers in the department, and to curtail Plaintiff's further abuse of Defendant's break policy. (Doc. 22-1, ¶ 4; Doc. 23-26, p. 8). Two months later, Defendant extended the initial performance review plan for an additional 30 days in response to complaints from a physician that Plaintiff allegedly failed to communicate with the physician during a procedure and later falsely accused the doctor of yelling at her during the procedure. (Doc. 22-1, ¶ 5; Doc. 23-2, p. 2).

At some point, Defendant made the decision to downsize staffing in the endoscopy department. (Pl. Dep., pp. 18, 110). Defendant temporarily stationed Plaintiff in a secretarial position in the diabetes clinic, where she was responsible for filing, answering phones, and reminding patients of their appointments. (Pl. Dep., p. 110). Plaintiff remained in the diabetes clinic for approximately two months before Defendant identified a more permanent position for Plaintiff as a supply room technician in the Emergency department. (Doc. 22-1, ¶ 6; Pl. Dep., pp. 18, 21, 110-11). During Plaintiff's time working in the Emergency department, Defendant twice placed Plaintiff on a 90-day action plan, once in October 2004 for poor attendance and failure to engage as a team member and again in April 2005 for inability to accept responsibility and to take initiative in the department. (Doc. 22-1, ¶ 6).

In 2006, Defendant downsized the Emergency department, which resulted in Plaintiff being transferred to the Materials Management department, where she assumed the position of Inventory Technician. (Doc. 22-1, ¶ 7; Pl. Dep., p. 26). As an Inventory Technician, Plaintiff was expected generally to operate and restock medical supply stations on a daily basis; routinely perform inventory expiration date checks; clean and organize inventory; and assist with inventory delivery. (Doc. 22-1, ¶ 8). The position required regular walking, reaching, stretching, balancing, crouching, and long periods of standing. (Doc. 22-1, ¶ 8).

According to Plaintiff's own testimony, the Inventory Technician position was physically taxing. (Doc. 22-1, ¶ 9; Pl. Dep., p. 13). During her employment with Defendant, Plaintiff weighed in excess of 400 pounds. (Pl. Dep., p. 132). She walked with a visible limp and frequently needed to sit down for five to ten minutes at a time to relieve pain in her back and legs. (Pl. Dep., pp. 130-31, 133). Plaintiff often struggled to load her supply cart because she was unable to climb the ladder to reach items located higher than her head and incapable of bending or stooping down to access items stored on the lower shelves. (Pl. Dep., pp. 33-35). As a result of these limitations, she required assistance from co-workers. (Pl. Dep., pp. 33, 35-36). Plaintiff alleges that at a certain point in time, her co-workers were instructed not to help her. (Pl. Dep., pp. 36-37).

4

Despite Plaintiff's physical limitations, she maintained her Inventory Technician position from 2006 through her termination in January 2013, but not without issue. (Doc. 22-1, ¶¶ 7, 9). During the final two years of her employment, Plaintiff was subject to no less than six disciplinary actions, placing her on an almost continuous action plan:

- <u>March 4, 2011</u>: Plaintiff received a written warning for failing to complete a work assignment.[3] Defendant also discovered that Plaintiff was suspending her job activities a full two hours before the end of her shift. At the time, Plaintiff's shift began at 10:00 a.m. and ended at 6:30 p.m. She fell into the habit of sitting down in the warehouse around 4:30 p.m. and not completing any further tasks.[4] Defendant subsequently placed Plaintiff on a 90-day action plan, warning her that failure to comply and complete the plan could result in termination. (Doc. 22-1, ¶¶ 11-12). Plaintiff satisfied the terms of the plan on May 12, 2011. (Doc. 23-8, p. 2).

- <u>September 5, 2011</u>: Plaintiff received a written warning for excessive unscheduled absences. (Doc. 22-1, ¶ 13).

---

[3] This particular incident involved a delivery ticket received by the Materials Management department from the Cardiac Rehabilitation unit on March 2, 2011. (Doc. 23-7, p. 2). Two days later on March 4, 2011, the ticket was found, and Defendant determined that the order had not been filled. (Doc. 23-7, p. 2). Plaintiff denied responsibility for the misplaced ticket. (Doc. 23-7, p. 2; Pl. Dep. 75-77).

[4] Plaintiff did not contest this allegation at the time and openly admitted to the infraction in the course of her deposition. (Doc. 23-7, p. 2; Pl. Dep. 74-75).

- June 27, 2012: Defendant received a report that while on the work clock, Plaintiff was observed spending time in the hospital room of a family member who had recently given birth. Defendant also learned that several areas of the hospital had not been restocked with supplies during the same time period. Defendant subsequently conducted a detailed review of Plaintiff's work log in conjunction with security camera footage and ultimately determined that over a two-day work period, Plaintiff worked a total of 52 minutes. Defendant suspended Plaintiff for three days and warned her that further infractions would lead to a 30-day action plan. (Doc. 22-1, ¶¶ 14-18).[5]

- July 12, 2012: Defendant placed Plaintiff on a 30-day action plan to improve her productivity and to limit any unscheduled breaks. (Doc. 22-1, ¶ 18). Plaintiff admitted that she was one of the slowest workers and that her inventory count regularly was in the low range. (Pl. Dep., p. 129-30). She also expressed understanding that the purpose of this particular action plan was to encourage her to increase her productivity. (Pl. Dep., p. 130).

- October 10, 2012: A personnel action request form dated October 10, 2012, indicates that Plaintiff was placed on a 30-day action plan but does not note the reason. (Doc. 23-14). The form did notify Plaintiff that she would not receive a merit increase and that she would be re-evaluated on November 11,

---

[5] Plaintiff denied wrongdoing and refused to sign the disciplinary action report; however, she could not account for her missing time. (Doc. 23-11).

2012 to determine whether she would receive a merit increase or be terminated. (Doc. 22-1, ¶ 19).

- November 19, 2012: Plaintiff was not recommended for termination. However, on November 19, 2012, Defendant placed Plaintiff on yet another action plan in an effort to improve Plaintiff's productivity as she still was not meeting Defendant's standards. (Doc. 22-1, ¶ 21). While Plaintiff's workload numbers did not increase by the end of the review period, on December 19, 2012, Defendant noted that Plaintiff's attitude toward work had improved and decided to conclude the action plan and to reevaluate her in a few weeks. (Doc. 22-1, ¶¶ 22-23).

The final event that culminated in Plaintiff's termination occurred on January 17, 2013. That morning, Clinton Bellamy ("Bellamy"), Assistant Director of the Materials Management department, observed Plaintiff talking with a co-worker, Melissa Barrett. (Doc. 22-1, ¶ 24). Twelve to fifteen minutes later, Bellamy walked back past the same location and noticed that Plaintiff and Barrett were still conversing. (Bellamy Dep., p. 26). He stopped and said, "all right, Melissa, get back to work, stop slowing Tomeca down." (Pl. Dep., p. 150; Bellamy Dep., p. 26). As Bellamy continued toward his office, Plaintiff followed and asked if she could speak to him. (Pl. Dep., p. 150). Bellamy informed her that it was not a good time to talk because the Joint Commission was in the building.

7

(Pl. Dep., p. 150; Bellamy Dep., p. 28). When Bellamy came back through the warehouse, Plaintiff approached him again and said, "The work jokes need to stop." (Pl. Dep. pp. 150-52; Bellamy Dep., p. 27-28). Bellamy asked what Plaintiff was talking about, and she explained that she was referring to Bellamy's comment to Melissa Barrett. (Doc. 22-1, ¶ 25). Bellamy explained that he was joking and that he was talking to Barrett and not to Plaintiff. (Doc. 22-1, ¶ 25). Bellamy told Plaintiff he was returning to work and suggested that she do the same. (Doc. 22-1, ¶ 25; Bellamy Dep., p. 28).

Plaintiff did not return to work; instead, she pursued Bellamy and accused him of never wanting to listen to her. (Doc. 22-1, ¶ 25; Bellamy Dep., p. 28). Bellamy responded, "If you heard what I wanted to say about you right now, you would not like it." (Doc. 22-1, ¶ 25). Bellamy again attempted to end the conversation and told Plaintiff to return to work. (Doc. 22-1, ¶ 25). However, as he continued toward his office, Plaintiff followed saying, "I'm a forty year old woman, . . . you don't talk to me any kind of way. You think you can talk to me any kind of way." (Doc. 22-1, ¶ 26). Bellamy told Plaintiff for a third time to go back to work. (Doc. 22-1, ¶ 26).  Plaintiff informed Bellamy that she was going to talk to Rhonda Smith, the Director of Materials Management. (Doc. 22-1, ¶ 26). Because Plaintiff was causing such a disturbance, Bellamy ordered her to clock

out and go home. (Doc. 22-1, ¶ 27). Plaintiff refused, insisting on talking to Smith. (Doc. 22-1, ¶ 27).

Eventually, Plaintiff did clock out, and she and Bellamy both went to meet with Smith. (Doc. 22-1, ¶ 27). Smith asked Human Resources Director Steve Dale to be a part of the meeting. (Doc. 22-1, ¶¶ 27-28). After hearing from both sides, Dale agreed that Plaintiff should go home for the remainder of the day and not return until contacted by Defendant. (Doc. 22-1, ¶ 28).

Smith thereafter conducted an investigation and gathered statements from several witnesses who attested to the loud and aggressive manner in which Plaintiff confronted Bellamy. (Doc. 22-1, ¶¶ 29-31). Smith also asked Bellamy to prepare a report detailing Plaintiff's disciplinary history. (Doc. 22-1, ¶ 32). With this information in hand, Smith made a recommendation to Human Resources that Plaintiff be terminated. (Doc. 22-1, ¶¶ 33-34). Human Resources concurred with the recommendation and terminated Plaintiff on January 21, 2013. (Doc. 22-1, ¶¶ 35-36). Defendant notified Plaintiff that she had a right to appeal her termination. (Pl. Dep., pp. 164-65). However, Plaintiff elected not to appeal. (Pl. Dep., 167). Plaintiff thereafter filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC"), alleging that Defendant had discriminated against her on account of her disability.[6]

## B.    Transfer Requests

Over the years, Plaintiff made several official and unofficial requests to transfer into other positions both within the Materials Management department and outside the department. On three separate yet unspecified occasions, Plaintiff asked to be considered for a secretarial position within Materials Management.[7] The first time she asked about the secretary opening, Clint Harris, who at the time was the Director of Material Management, responded, "No. We want somebody pretty with long hair to sit up at the front desk." (Pl. Dep., pp. 45-46). The second time she inquired about the position, Plaintiff was assured that, when the time came, she would be the first to know about when interviews would take place, but she never heard anything. (Pl. Dep., p. 29).  The third time she asked to be made secretary, Bellamy told Plaintiff that he would not place her in the position because she was "too ghetto." (Pl. Dep., pp. 29, 48-49).

---

[6] Plaintiff's charge of discrimination has not been made a part of the record. According to Plaintiff's deposition testimony, she filed her initial charge by at least April 5, 2013. (Pl. Dep., p. 196). Defendant states in its supporting brief that Plaintiff filed her charge of discrimination on March 19, 2013. (Doc. 22-2, p. 5). Plaintiff amended her charge on June 7, 2013. (Doc. 23-20).

[7] At her deposition, Plaintiff was unable to provide details regarding when she made these particular requests. However, she did concede that her efforts to obtain the secretary job predated her formal transfer requests to move outside the department. (Doc. 22-1, p. 41).

Plaintiff made four documented requests to transfer to various different positions outside the Materials Management department. She made those requests on September 15, 2010, March 8, 2011, May 9, 2011, and November 7, 2011. (Doc. 22-1, ¶ 42). With the exception of the final request, it is not apparent from the record why Defendant denied each of these transfer requests.[8] The transfer form dated November 7, 2011, however, contains a notation that Plaintiff was not eligible for transfer at that particular time based on Defendant's policy not to grant transfer requests for employees who have been on an action plan within the past six months. (Doc. 22-1, ¶¶ 44-45; Doc. 23-21, p. 7).

### C.   FMLA Leave

Two different events necessitated Plaintiff's use of FMLA leave. On July 19, 2001, shortly after she began working for Defendant, Plaintiff took FMLA leave for gallbladder surgery. (Doc. 22-1, ¶ 38). Plaintiff returned to work on July 30, 2001. (Doc. 22-1, ¶ 38). Several years later, beginning December 29, 2009, Plaintiff took FMLA leave again to undergo a hysterectomy after being diagnosed with uterine cancer. (Doc. 22-1, ¶ 39). Plaintiff returned to work on February 15,

---

[8] Defendant suggests that Plaintiff was not qualified for the secretarial positions to which she requested transfer because Plaintiff admittedly was not proficient in various computer programs and lacked other general secretarial skills. (Doc. 22-1, ¶ 43). However, the record does not contain a job description for the position, nor is there any testimonial or documentary evidence about why Plaintiff was not considered for the position. Accordingly, the Court finds this assertion to be unsupported by the evidence.

2010. (Doc. 22-1, ¶ 39). Plaintiff made no other requests for FMLA leave during the remainder of her time working for Defendant.

### D.   Social Security Disability Application

Plaintiff applied for Social Security Disability benefits on March 27, 2013. (Doc. 22-1, ¶ 46). As a part of her application, Plaintiff alleged that she has the following severe impairments: osteoarthritis, morbid obesity, multi-level osteoarthritis of her lumbar spine, paravertebral muscle spasms, non-pitting edema, venous stasis changes, obstructive sleep apnea, and shortness of breath. (Doc. 23-27, p. 7). Plaintiff further attested that she became unable to work due to her disabling condition on January 21, 2013, the date of her termination. (Doc. 22-1, ¶ 47). The Social Security Administration issued a fully favorable decision on February 5, 2015, finding Plaintiff disabled as of January 21, 2013. (Doc. 21-1, ¶ 48).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson

12

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

13

### III.   DISCUSSION

Plaintiff, who claims she is disabled due to osteoarthritis, chronic lower back pain, edema, fibromyalgia, and sleep apnea, worked for Defendant for just shy of twelve years before being terminated for unprofessional conduct and poor work performance.[9] During her tenure with Defendant, Plaintiff alleges that she made numerous demands for Defendant to accommodate her disability in the form of transfer requests, which Defendant impermissibly denied. Plaintiff avers that Defendant ultimately terminated her both in retaliation for her request that Defendant accommodate her physical limitations and for taking leave guaranteed to her by the FMLA. Defendant moves for summary judgment on all of Plaintiff's claims, arguing that, viewing the undisputed facts in a light most favorable to Plaintiff, Plaintiff cannot establish a prima facie case of discrimination or retaliation under either the ADA or the FMLA.

### A.   Plaintiff's ADA Claims

In Count I[10] of her Second Amended Complaint, Plaintiff sets forth a claim of discrimination based on her disability under the ADA. To establish a prima

---

[9] Plaintiff is admittedly morbidly obese, weighing in excess of 400 pounds. (Pl. Dep., p. 132). However, Plaintiff does not contend that her weight qualifies as a disability. See, e.g., Greenberg v. BellSouth Telecomm., Inc., 498 F.3d 1258, 1264 (11th Cir. 2007) ("except in rare circumstances, obesity is not considered a disabling impairment") (citation omitted)

[10] Plaintiff's Second Amended Complaint contains three counts: "COUNT I – DISABILITY DISCRIMINATION," "COUNT II – RETALIATION," and "COUNT III –

facie case of employment discrimination under the ADA, a plaintiff must demonstrate that "(1) [s]he has a disability, (2) [s]he is a qualified individual, which is to say, able to perform the essential functions of the employment position that [s]he holds or seeks with or without reasonable accommodation, and (3) the defendant unlawfully discriminated against [her] because of the disability." D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1226 (11th Cir. 2005) (internal quotations omitted).

For the purpose of this motion, Defendant does not contest that Plaintiff meets the ADA's definition of disabled. However, Defendant contends that Plaintiff is estopped from claiming that she is a qualified individual with a disability based on her representation to the Social Security Administration (SSA) that she was totally and permanently disabled as of the date of her termination. Defendant further maintains that Plaintiff never requested an accommodation.

VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT." In Count I, Plaintiff states, "This is an action for hostile work environment disability discrimination and disparate treatment." (Doc. 13, ¶ 18). First, it is not clear whether a cause of action for hostile work environment is available under the ADA. See, i.e., Palmer v. Albertson's LLC, 418 Fed.App'x 885, 889 (11th Cir. 2011). Second, even if a hostile work environment claim is actionable under the ADA, Plaintiff has taken no pains either to properly plead a count for hostile work environment or to argue why the claim should not be dismissed. Accordingly, the Court declines to consider the claim. Id.; see also Copeland v. Ga. Dep't of Juvenile Justice, 2013 WL 1296778, at *13 (M.D.Ga. March 27, 2013) ("A hostile work environment claim stands on its own. The Court and opposing parties should not have to guess whether a hostile work environment claim is hiding in a discrimination count. Plaintiff should have articulated a separate count in her complaint alleging the hostile work environment claim.")

However, should Plaintiff's applications to transfer to another position be interpreted as requests for accommodation, Defendant argues that Plaintiff's discrimination claim is statutorily barred.

### 1.   Qualified Individual with a Disability

Under the ADA, an employer may not discriminate against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). In order to be a "qualified individual," the plaintiff must be able to perform the essential functions of her employment position with or without reasonable accommodation. 42 U.S.C. § 12111(8); see also Reed v. Heil, 206 F.3d 1055, 1062 (11th Cir. 2000). Accordingly, "[b]ecause the ADA reserves its protections for individuals still able to perform the essential functions of a job, albeit with reasonable accommodation, a plaintiff who is totally disabled and unable to work at all is precluded from suing for discrimination thereunder." Kurzweg v. SCP Distributors, LLC, 242 Fed.App'x 840, 843 (11th Cir. 2011) (quoting Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1280 (11th Cir. 2005)).

On March 27, 2013, Plaintiff filed an application for Social Security Disability ("SSDI") benefits, claiming that as a result of her various disabling conditions she became unable to work at all as of January 21, 2013, the date of her termination. (Doc. 22-1, ¶¶ 46-47). After conducting a review of the evidence submitted by Plaintiff to the agency, an Administrative Law Judge ("ALJ") for the

16

SSA found Plaintiff met the SSA's definition of disabled as of January 21, 2013 and issued a fully favorable decision on February 3, 2015. (Doc. 22-1, ¶ 48; Doc. 23-27, pp. 5-14). The question now before the Court is whether Plaintiff's SSDI claim creates a genuine conflict with her ability to assert an ADA claim.

An SSDI applicant must demonstrate that she has a disability so severe that she is "unable to do [her] previous work" and "cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Because the ADA requires the plaintiff show that she is a "qualified individual," meaning that she can perform her requisite job duties with or without an appropriate accommodation, any claim or finding that the plaintiff also satisfies the SSA's definition of disability would seemingly stand in juxtaposition. However, the Supreme Court has explicitly held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 797 (1999). In Cleveland, the Supreme Court set forth three scenarios under which an ADA plaintiff may be able to perform the essential functions of her employment and still be deemed disabled by the SSA:

> First, an SSDI applicant might be able to perform the work with a reasonable accommodation, but the SSA does not take possible reasonable accommodations into account in determining whether an SSDI applicant is disabled. Second, an SSDI applicant who can actually perform the work may qualify as disabled under the impairment listings in the SSA's regulations. Finally, an SSDI

17

applicant may fall within the agency's nine-month trial-work period used to facilitate reentry into the workforce.

Kurzweg v. SCP Distributors, LLC, 424 Fed.App'x 840, 843-44 (11th Cir. 2001) (citing Cleveland, 526 U.S. at 803-05) (internal citations omitted).

Nevertheless, "an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work." Cleveland, 526 U.S. at 797. And, in order to survive a motion for summary judgment, "she must explain why that SSDI contention is consistent with her ADA claim that she could perform the essential functions of her previous job, at least with reasonable accommodation." Id. (quotations omitted). "[T]hat explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of the job, with or without reasonable accommodation." Id. at 807 (quotations omitted).

Plaintiff's statement to the SSA that she is totally and permanently disabled directly contradicts her ADA claim. Not only has Plaintiff failed to offer a sufficient explanation to resolve this apparent conflict, she has ignored the issue altogether and made no effort to reconcile the inconsistencies between her representations to the SSA and the claims asserted in this ADA lawsuit. It is undisputed that Plaintiff applied for SSDI benefits and that the SSA found her disabled and unable to perform her past relevant work as of January 21, 2013. In the absence

of any explanation for her inconsistent representations, Plaintiff is estopped from claiming under the ADA that she was able to perform the essential functions of her job. Summary judgment is thus properly granted.

### 2.      Reasonable Accommodation

Even if the Court found that Plaintiff's SSDI claim did not estop her from arguing that she meets the ADA's requirements as a "qualified individual," Plaintiff's allegation that Defendant discriminated against her by failing to reasonably accommodate her fails as a matter of law. There simply is no evidence that Plaintiff ever made a request that Defendant accommodate her disability. However, to the extent that Plaintiff's requests to transfer to other departments may be categorized as requests for accommodation, Plaintiff's claim is procedurally barred.

An employer's failure to provide a reasonable accommodation for an employee's known physical or mental limitations can be a form of unlawful discrimination. 42 U.S.C. § 12112(b)(5)(A) (requiring an employer to reasonably accommodate a known physical or mental limitation unless "the accommodation would impose an undue hardship" on the employer); see also Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1262 (11th Cir. 2007). "An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job." Earl v. Mervyns, Inc., 207 F.3d 1361,

1365 (11th Cir. 2000) (holding that an employer must provide reasonable accommodations for employees with known disabilities unless doing so would cause the employer undue hardship).

However, the employee bears the burden of identifying a reasonable accommodation. Id. at 1367. Where the employee fails to do so, the employer has no duty to engage in the "interactive process." Id. Thus, "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." Gaston v. Bellingrath Gardens & Homes, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999); Willis v. Conopco, Inc., 108 F.3d 282, 285 (11th Cir. 1997) ("[T]he ADA provides no cause of action for 'failure to investigate' possible accommodations.") "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." Moriskey v. Broward Cty., 80 F.3d 445, 448 (11th Cir. 1996); see also Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1183 (11th Cir. 2005) (holding that "discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent").

Plaintiff has presented no evidence that she ever made a specific request for Defendant to accommodate a known disability. Plaintiff's only impairment that was readily ascertainable by Defendant was her weight and the obvious limitations Plaintiff's physical size placed on her mobility. But Plaintiff has

presented no evidence that she ever informed Defendant about the full extent of her medical condition, nor has she shown that she made a request that Defendant accommodate her physical impediments by, for example, permitting her more frequent sitting breaks. While Plaintiff contends that she frequently implored co-workers to climb ladders or to stoop down to retrieve supplies for Plaintiff because she was unable to perform these tasks herself (Pl. Dep., p. 33), Plaintiff's supplications to these co-workers did not sufficiently satisfy her burden of informing her employer about the need for a specific accommodation to trigger Defendant's duty to provide her with any accommodation.

Plaintiff argues that she requested an accommodation in the form of transfers to other departments. Although there is no evidence that Plaintiff ever articulated to Defendant that she wished to transfer to another position because she suffers from a particular disability, to the extent that Plaintiff's transfer requests may be construed as adequate requests for accommodation, her claims are time barred. Any claims raised under the ADA must also comply with the procedural requirements set forth in Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 12117(a) (incorporating the procedures articulated in 42 U.S.C. § 2000e-5). Therefore, prior to filing a lawsuit in district court, a plaintiff first must file a timely charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1); Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001). Georgia is a

non-deferral state, which means that, in order for her charge to be timely, Plaintiff in this case was required to file her charge within 180 days of when the alleged violation occurred. Id.[11]

Plaintiff made four documented requests to transfer out of the Materials Management department. She submitted those requests on September 15, 2010, March 8, 2011, May 9, 2011, and November 7, 2011. In order properly to raise a claim of discrimination based on Defendant's purported failure to transfer Plaintiff to another department as an accommodation for her disability, Plaintiff had to file a charge of discrimination at least within 180 days of her final transfer request, or by no later than May 5, 2012. However, Plaintiff did not file a charge of discrimination with the EEOC until March or April 2013, almost a calendar year too late. Plaintiff's failure to accommodate claim is thus procedurally barred.

---

[11] When at least one of the plaintiff's alleged violations occurred within the statute of limitations, district courts may apply the continuing-violation doctrine to salvage a time-barred claim. See Abram v. Fulton Cty. Gov't, 598 Fed. App'x 672, 675 (11th Cir. 2015) (citing Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1221-22 (11th Cir. 2001)). However, the Supreme Court has clarified that 42 U.S.C. § 2000e-5(e)(1) precludes recovery under the continuing-violation doctrine for discrete acts of discrimination that occurred outside the statute of limitations. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105, 110-15 (2002). Rather, each discrete act, such as the denial of a transfer, initiates a new clock for filing a charge of discrimination with the EEOC. Id. Accordingly, under the evidence presented in this case, Plaintiff's claim cannot be salvaged by the continuing-violation doctrine.

### B.     Plaintiff's Retaliation Claims

Plaintiff next alleges that as a result of voicing opposition to Defendant's purported unlawful employment practices, Defendant retaliated against her. Plaintiff contends that Defendant retaliated against her by terminating her and by providing negative employment references to prospective employers following her separation. Defendant argues that Plaintiff's retaliation claim fails because Plaintiff has produced no evidence that she engaged in statutorily protected conduct, and, even if she did, there is no causal connection between any alleged activity and Plaintiff's termination.

The ADA's retaliation provision makes it unlawful to discriminate against any person who "opposed any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a). A plaintiff may establish a prima facie case of retaliation by demonstrating that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).

Plaintiff points to no evidence that she participated in any protected activity. In support of this element of her prima facie case, Plaintiff argues in totality:

> Plaintiff engaged in almost continuous protected activity from the first date [s]he voiced opposition to Defendant's efforts to violate the statute by refusing to provide a reasonable accommodation. She objected to Defendant's discriminatory practices multiple times. Again and again, she asked to be accommodated. Again and again she raised the issue of unfair treatment at the hands of Defendant. This is all protected activity.

(Doc. 26, p. 12).

Plaintiff fails to offer any specifics, including when or how she asked to be accommodated, when she complained that Defendant failed to provide her an accommodation, or to whom she voiced any of these complaints. Plaintiff's bald and unsubstantiated allegations that she partook in a statutorily protected activity are not enough to satisfy the first prong of her prima facie case. Further, during her deposition, Plaintiff admitted that she never reported to Human Resources that she felt Defendant was discriminating against her because she was disabled. (Pl. Dep., p. 200). However, on an occasion in 2011, she did complain to Human Resources that management was expecting her to perform both her work and the work of other department members. (Pl. Dep., pp. 187-90). According to Plaintiff, management later chastised her for going straight to Human Resources. (Pl. Dep., p. 188-89). Plaintiff also testified that at some point she expressed to members of management that she felt as though she was being picked on because she was unable to move as quickly or perform as much work as her co-workers. (Pl. Dep., pp. 200, 203-04). But Plaintiff could not

account for when this conversation took place, claiming vaguely that it occurred sometime in 2012. (Pl. Dep., p. 200). The only other protected activity in which Plaintiff claims she engaged took the form of requests to transfer to a position outside of the Materials Management department. As previously discussed, though, there is no evidence that Plaintiff ever made clear to Defendant that she desired a transfer as an accommodation for a known disability.

Giving Plaintiff the benefit of the doubt, and accepting Plaintiff's contention that she engaged in statutorily protected activity, Plaintiff still cannot satisfy the essential elements of her prima facie case because she has not demonstrated a causal connection between the alleged protected expression and her termination. To establish a causal connection, the plaintiff may show a "close temporal proximity" between the protected activity and the adverse action. Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 799 (11th Cir. 2000); see also Henderson v. FedEx Express, 442 Fed.App'x 502, 506 (11th Cir. 2011) (six month gap is too long); Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1182 (11th Cir. 2010) (three months is too long); Jiles v. United Parcel Servs., Inc., 360 Fed.App'x 61, 67 (11th Cir. 2010) (eight months is too long).

Plaintiff's alleged conversation with Human Resources took place at some point in 2011. She submitted her transfer requests in 2010 and 2011 and verbally complained about Defendant's treatment of her at some unspecified time in

2012. Defendant did not terminate Plaintiff until the end of January 2013, meaning that there was between a year and three years between each alleged instance of Plaintiff's involvement in a protected activity and the date of the adverse employment action. Thus, the alleged protected activity is too distant in time to qualify as being causally related to Plaintiff's termination, and Plaintiff's retaliation claim fails as a matter of law.

Additionally, there is no evidence to validate Plaintiff's claim that Defendant retaliated against her by providing negative employment references following her termination. Plaintiff premises this claim entirely on her supposition that because no prospective employers responded to her applications, Defendant must have provided an unfavorable reference. (Pl. Dep., p. 208). Plaintiff's speculation is not enough to prove retaliation. See Shiver v. Chertoff, 549 F.3d 1343 (11th Cir. 2008) ("Speculation does not create a genuine issue of material fact.") (internal quotation and emphasis omitted).

Plaintiff has failed to establish the essential elements of her retaliation claim. "Where the nonmoving party has failed to make a sufficient showing to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial, there exist no genuine issues of material fact." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir.

1996) (internal quotations and citation omitted). Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's claim of retaliation.

### C.    Plaintiff's FMLA Claims

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the function of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Two types of claims may arise under the FMLA, "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Strickland v. Water Works and Sewer Bd. of the City of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted).

In her Amended Complaint, Plaintiff alleges that Defendant retaliated against her for exercising her right to FMLA leave. To establish retaliation, an employee must demonstrate that her employer intentionally discriminated against her for exercising a right guaranteed under the FMLA. Martin v. Brevard Cnty. Pub. Sch., 543 F.3d 1261, 1267-68 (11th Cir. 2008) ("Unlike an interference claim, an employee bringing a retaliation claims faces the increased burden of showing that his employer's actions were motivated by an impermissible

27

retaliatory or discriminatory animus.") (internal quotation omitted). In the absence of direct evidence of the employer's intent, courts evaluate FMLA retaliation claims under the McDonnell Douglas burden-shifting framework. Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1243 (11th Cir. 2010). Accordingly, to establish a prima face case of FMLA retaliation, the plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected conduct." Id.

It is undisputed that Plaintiff required the use of FMLA leave on two occasions and that she later was terminated. However, there was no temporal proximity to link the two events and to demonstrate that one was the cause of the other. In order to develop the causal connection element, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (internal citation and quotation omitted). "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Brungart, 231 F.3d at 799. Temporal proximity, without more, must be very close. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (citing Clark Cty. Sch. Dist. v. Breeden, 532

U.S. 268, 273 (2001). "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." Id.; see also Breeden, 532 U.S. at 273 (citing Richmond v. ONEOK, 102 F.3d 205, 209 (10th Cir. 1997) (three month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four month period insufficient)).

Plaintiff readily admits that her FMLA leave was unrelated to her termination. (Pl. Dep., p. 209). Even in the absence of this admission, Plaintiff's FMLA retaliation claim fails because she has shown no causal connection between her request for medical leave and her termination. Plaintiff took FMLA leave once in 2001 following the removal of her gallbladder and again in 2010 after a cancer diagnosis necessitated extraction of her uterus. Defendant did not terminate Plaintiff's employment until 2013, a span of time far too great to create a causal connection. Defendant, therefore, is entitled to summary judgment on Plaintiff's FMLA retaliation claim.

**Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 22) is granted, and this case is dismissed with prejudice.

**SO ORDERED**, this the 22nd day of February, 2016.

*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

aks